

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Adam Holm, Daniel Holm, Nick Holm, and Rebecca Holm, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 05 C 3910 |
| v. | ) ) ) | Hon. Mark Filip |
| Village of Coal City, Officer Chris Harseim, Officer Russell Nidiffer, Officer Tom Best, Officer Jason Clark, Sergeant William Klegman, Sergeant Jim Howell, Coal City Police Chief Dennis Neary, Grundy County Sheriff's Deputy Rick Onsen, Assistant State's Attorney John Schaller, and Bill Shain, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

*Pro se* plaintiff Adam Holm ("Holm" or "Plaintiff") filed suit in this Court on July 5, 2005, on behalf of himself and his children. (*See* D.E. 1.[1]) The operative complaint is Plaintiff's Second Amended Complaint ("Complaint"), filed April 28, 2006, which is discussed further below. (*See* D.E. 71.) Before the Court are Defendants' various motions to dismiss for failure to state a claim upon which relief can be granted. (*See* D.E. 79, 82, and 85.) For the reasons stated below, Defendants' motions are granted in part and denied in part. Defendant Assistant State's Attorney John Schaller is dismissed from the case, as explained below.

---

[1] The Court takes the spellings of Defendants' names from Plaintiffs' Complaint, though there are inconsistencies between the Complaint and its attached exhibits, as well as among the three motions to dismiss.

## FACTS

Before relating the factual allegations, a few preliminary comments are appropriate. First, the various motions to dismiss assume that the Complaint (which does not specifically identify any claims that are being advanced) is raising claims under 42 U.S.C. § 1983, the federal statute typically used to advance civil rights claims against local officials and municipalities. Plaintiff's responses also seem to be based on the same premise. The Court will evaluate the Complaint, and, in particular, the motions to dismiss, on such a basis, as that appears to be how the parties have presented the case.[2]

Second, the Court takes the relevant facts from Plaintiffs' Complaint and the exhibits they attached (D.E. 71). As precedent prescribes, the Court accepts the allegations as true. It is clear that the Defendants strenuously disagree with many, if not most, of the allegations. The Court takes no position on whether any of the allegations are, in fact, true.

Third, by way of overview, the Complaint claims years of harassment, discrimination, and other negative interactions with the Coal City Police Department and other officials in Grundy County. (*See* D.E. 71 at 6.) The heart of the Complaint revolves around certain incidents that took place in the summer of 2005. Those incidents led to several tickets and criminal charges being issued against Mr. Holm and his son Daniel, which variously led to certain dismissals and at least one conviction. (*See* D.E. 71 at 3–4.) This opinion describes each incident in turn.

---

2 To the extent there are any putative or theoretical state law pendent claims, Defendants have not moved to dismiss them, and the Court therefore will not speculate about them.

### Acts Leading to Criminal Charges against Adam and Daniel Holm

The first of the incidents allegedly took place on June 30, 2005. Mr. Holm was arrested for battery after a woman filed charges against him for spitting on her child. (*See, e.g.*, D.E. 85-3 at 8.[3]) Plaintiffs have attached as an exhibit a police report concerning the incident, and in that report is a reference to Mr. Holm stating that nothing is ever done by the police department about his complaints against others. (*See id.* at 12.) That report further suggests that both the complainant concerning the spitting incident (*i.e.*, the child's mother) and Mr. Holm believe that they have slashed each other's respective car tires; Mr. Holm also apparently contends that the child, whom Mr. Holm refers to as "Rooster," also threatens him. (*Id.*) Holm was taken into custody, booked, and released on $100 cash bond. (*See id.* at 13.)

The second and third alleged incidents of the Summer of 2005 occurred on July 2. The second incident involved a traffic stop. Officer Chris Harseim stopped Daniel Holm for riding an electric scooter on a public roadway. (*See* D.E. 71, attached traffic citation; *see also* D.E. 85-4 at 15 through D.E. 85-5 at 4 (scanned copies of traffic citations).) Daniel pulled over in an alley where Mr. Holm was standing. (*See* D.E. 85-4 at 6.) Officer Harseim called Coal City Police Sergeant William Klegman to assist him, and he then reminded Daniel that Officers Harseim and Clark had previously told Daniel that he was not to ride the electric scooter on the roadway. (*Id.*) Officer Harseim issued Daniel a ticket for riding the motor scooter on the roadway, and he gave

---

3 Plaintiffs' exhibits, included with his Complaint at D.E. 71, are not consistently paginated or labeled, nor have they been scanned and posted on the Court's electronic filing system. However, the Amended Complaint and its exhibits are attached as an exhibit to one of the motions to dismiss. (*See* D.E. 85-2 through D.E. 85-10 (Village of Coal City and various police officer defendants' Ex. A).) For clarity, the Court cites to this defense exhibit when referring to Plaintiffs' various exhibits.

3

Mr. Holm one for permitting an unauthorized person (Daniel then appears to have been some fourteen years old) to drive the motorized vehicle on the roadway. (*Id.*) Both of these tickets were later dismissed. (*See* D.E. 71 at 1.) During the scooter traffic stop, the officers decided to impound Daniel's scooter because it didn't have working lights and because it was, at least in their view, not registered to be driven on the roadway as operated. (*See* D.E. 85-4 at 6.) It further appears that the officers contend that: (1) they accepted Mr. Holm's representation that he would walk the motor scooter to the police station with his son, Daniel, instead of the officers taking the scooter from him off the street; and (2) that neither Mr. Holm nor his son ever subsequently showed up with the scooter as promised. (D.E. 85-4 at 6.) It further appears that Plaintiffs disagree with this account, but they offer no specific alternative as to the facts as they unfolded. Plaintiffs attach various disparate documents (copies of Illinois statutes, photos of the scooter, *etc.*, *see* D.E. 85-5 at 13–15 and D.E. 85-6 at 1–9), by which they appear to contend that it was lawful for Daniel to ride the vehicle as he did, and therefore, lawful for Mr. Holm to allow Daniel to ride it as he did.

The third incident occurred later that day when Officers Harseim and Klegman went to Mr. Holm's apartment in an attempt to seize the scooter. They knocked on Mr. Holm's door, but no one answered. (D.E. 85-4 at 6.) The officers could see Mr. Holm and Daniel inside the residence looking at them and waving. (*Id.*) The Holms ignored commands to answer the door, so the officers returned to the police department and signed a criminal complaint against Mr. Holm for obstructing a peace officer. (*Id.*) At an unspecified later date, Officer Harseim took the scooter from Daniel, when he saw him riding it on a sidewalk, and impounded it; the allegations are unclear as to whether the lights on the scooter were working at that time. (D.E. 71 at 20.)

4

Allegedly Officer Jason Clark subsequently refused to return the scooter in April 2006 despite a state court order to do so. (*Id.* at 8.) Mr. Holm was subsequently convicted of a modified charge concerning the events of July 2—obstruction of service of process. (*See* D.E. 85-11 at 3–4.)

The final summer 2005 incident took place the following day, July 3. Officer Jason Clark saw Mr. Holm driving (with two of his children and one of their friends) at approximately 9:40 p.m. with a broken headlight and pulled him over. (*See, e.g.*, D.E. 85-9 at 13–14, 23.) In addition to the broken headlight, Officer Clark knew Officer Harseim had signed a complaint against Holm the previous day for obstructing a peace officer. (D.E. 85-4 at 6.) Before approaching Mr. Holm's automobile, Officer Clark called for assistance. Grundy County Sheriff's Deputy Rick Onsen arrived shortly thereafter. Mr. Holm also called his friend, William VanArkle, who apparently has picked up Mr. Holm's children on other occasions, perhaps after Mr. Holm's having been arrested. (D.E. 85-9 at 26.) With Deputy Onsen's assistance, Officer Clark took Mr. Holm into custody. While arresting Mr. Holm, however, Officer Clark and Deputy Onsen allegedly yanked Mr. Holm's arm up, and they allegedly pushed and punched Mr. Holm's shoulder, neck, and upper back, resulting in injury to his "right arm rotary." (D.E. 71 at 7; D.E. 85-9 at 2; D.E. 89 at 5.) The medical reports that Mr. Holm attaches to his complaint, which he seemingly offers as evidence of his injuries, reflect that he stated that he suffered a motor vehicle accident the day before he went to the hospital, although he seemingly also told emergency room personnel that his neck and shoulder had been hurting before the car accident as a result of his getting "hit in the back by a couple cops." (D.E. 85-4 at 8, 11, 14.) After the arrest, Officer Clark called Quality Auto Towing, which is owned by Bill Shain, to tow Mr. Holm's automobile. (D.E. 85-5 at 11.) The officers released the children to Mr. VanArkle. (*Id.*)

Ultimately, Officer Clark issued a ticket to Mr. Holm for improper lighting due to the broken headlight, and also charged Mr. Holm with resisting arrest. (*Id.*) Both of these charges were later dismissed. (D.E. 71 at 7–8.) Officer Clark also served Mr. Holm with the tickets Officer Harseim had written the previous day for allowing an unauthorized person to drive and for obstructing a peace officer. (D.E. 85-5 at 11.) The unauthorized driving ticket was later dismissed, and the charge for obstructing a peace officer was changed to obstructing service of process. (D.E. 71 at 3–4.) Mr. Holm was convicted by a jury of that charge. (*See* D.E. 85-11 at 3–4 (transcript of Mr. Holm's trial for obstructing service).[4]) Officer Clark also served Mr. Holm with the ticket Officer Harseim had written against Daniel for operation of a motorized pedal scooter upon a road. (D.E. 85-5 at 11.) That ticket was also later dismissed. (D.E. 71 at 3.)

### Alleged Stalking and Harassment of Mr. Holm and His Children

Mr. Holm alleges several instances of stalking and more generalized harassment of his children during the summer of 2005. For example, on July 28, Officer Harseim allegedly followed Mr. Holm's daughter Rebecca and five of her friends for five blocks. (D.E. 71 at 10.) On August 12, 13, and 14, various officers, including Sergeant Jim Howell and Officer Harseim, allegedly sat in a parking lot, where they could watch Mr. Holm's children, for about an hour.

---

4 Defendants' Ex. B (D.E. 85-11) is properly considered on this motion to dismiss because it consists of four pages from a transcript of Plaintiff's trial for obstructing service. The charge for obstructing service is referenced in the Complaint and central to Plaintiff's claims, and therefore this transcript is deemed part of the Complaint even though the portion of the proceedings showing the guilty verdict against Plaintiff is missing from it. *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (citing *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998); *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994); *Venture Associates v. Zenith Data Systems*, 987 F.2d 429, 431 (7th Cir. 1993)).

(*Id.* at 15.) On August 15, Officer Harseim and Sergeant Howell followed Mr. Holm, and continually drove by his residence for thirty minutes to an hour. (*Id.* at 16.) At some point during the summer, Officer Harseim told Mr. Holm that he could not have water-balloon and squirt-gun fights at or perhaps in his apartment. (*Id.* at 11.) Coal City Police Chief Dennis Neary called some of Holm's co-tenants in the apartment complex and talked with them about Holm to make him "look bad." (*Id.* at 11–12.) Also during this period, Officers Harseim, Clark, and Howell allegedly were continually "threatening Nick Holm," Mr. Holm's younger, developmentally disabled son, telling him that "they will arrest him if he rides his [three-]wheel bike on the road or uptown." (*Id.* at 9.) The officers also allegedly threatened to arrest Nick if he called people bad names. (*Id.* at 10.) In June, Officer Clark allegedly made a remark in front of and referring to Daniel saying, "There[']s another one [we'll] be able to put in jail in a couple of y[ears]." (*Id.* at 10.) Officer Harseim also allegedly called the Morris Daily Herald, which employs Daniel as a paperboy, to complain about Daniel cutting through Officer Harseim's yard. (*Id.* at 12.) Officer Harseim also allegedly had his wife put their Rottweiler outside to attack Daniel. (*Id.* at 13.)

### Failure to Investigate Crimes against Holm

Mr. Holm alleges that the Coal City Police and the state's attorney's office failed to investigate an attack on Holm by a man with a baseball bat. (*Id.* at 14.) They also allegedly failed to address reports of Holm's tires being slashed (*id.* at 16), and reports of Holm's children's bicycles being stolen (*id.*).

### Conspiracy and Retaliation

Plaintiff alleges that Chief Neary and Sgt. Klegman have "always been behind what Coal

7

City police officers [do] to me." (*Id.* at 18; *see also id.* at 4–5, 12 (broadly, albeit generically, alleging a conspiracy of officers against Holm and his children), 21 (similar, and including "Bill Shain as owner of Quality Auto").) Holm claims that Chief Neary, Sgt. Klegman, and others in the department, including Onsen, who is himself a former Coal City Police Officer, do this in retaliation for a previous lawsuit that Mr. Holm brought against them, which led to an unspecified settlement before Judge Holderman in this judicial district. (*Id.* at 4–5, 13, 17, 21; D.E. 89 at 6.)

## LEGAL STANDARDS

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing the pleader is entitled to relief." This, in turn, requires a plaintiff to allege no more than "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002) (citation omitted). Fair notice requires a complaint to include "the operative facts upon which a plaintiff bases his claim." *Rodgers v. Lincoln Towing Serv., Inc.*, 771 F.2d 194, 198 (7th Cir. 1985). A plaintiff can plead himself out of court by pleading facts that undermine the allegations set forth in his complaint. *McCormick v. City of Chicago*, 230 F.3d 319, 325 (7th Cir. 2000). *Pro se* complaints are construed generously. *Id.*

In ruling on a motion to dismiss, the court must assume all facts alleged in the complaint to be true and view the allegations in the light most favorable to the plaintiff. *See, e.g., Singer v. Pierce & Assocs., P.C.*, 383 F.3d 596, 597 (7th Cir. 2004). Dismissal for failure to state a claim is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lee v. City of Chicago*, 330 F.3d 456,

8

459 (7th Cir.2003) (internal quotation marks and citation omitted).

## DISCUSSION

The Complaint does not identify any specific § 1983 claims. The Court has construed it generously, as precedent directs, as against the arguments raised in the motions to dismiss and responses thereto. For the reasons stated below, Defendants' motions to dismiss these claims are granted in part and denied in part.

To state a cognizable § 1983 claim, a plaintiff must allege that (1) a person acting under color of state law engaged in conduct that (2) deprived him of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *accord, e.g.,* *Starnes v. Capital Cities Media, Inc.*, 39 F.3d 1394, 1396 (7th Cir. 1994). All of Plaintiff's claims, with the exception of the claims against Quality Towing owner Bill Shain, are clearly against persons or entities acting under color of law: police officers, a sheriff's deputy, an assistant state's attorney, and the Village of Coal City.

Therefore, the salient issues with respect to claims against these state actors is whether Plaintiff has alleged violations of clearly established constitutional rights not barred by an immunity doctrine or other principles, such as those in *Heck v. Humphrey*, 512 U.S. 477 (1994). As to the incidents of July 2, Mr. Holm appears to allege that the scooter traffic stop was part of the harassment and discrimination the Coal City police allegedly inflicted upon him, and, in particular, that the scooter was subsequently taken from Daniel Holm in violation of his Fourth Amendment rights. (*See* D.E. 71 at 6.) Plaintiff's claims regarding his June 30 arrest for battery (*i.e.*, for his alleged spitting on the child, Kenneth Smith, whom he refers to as "Rooster," *see* D.E. 85-3 at 8) also appear to fit in the general harassment and discrimination category; he does

9

not appear to allege that his arrest on June 30 was illegal—a claim that seemingly would be quite difficult to maintain, given that the complaint was based on a call from a private citizen and her accusations. With respect to his July 3 arrest (for obstructing a peace officer on July 2 and resisting an officer during the July 3 arrest), Plaintiff's Complaint can be understood to allege various Fourth Amendment claims (*e.g.*, for excessive force (D.E. 71 at 7), unreasonable seizure of his car (*id.* at 6), and for false arrest (*id.* at 17 ("I was falsely arrest[ed] [and charged] for resisting a peace officer")). Otherwise, Plaintiff makes general claims of retaliation for previously suing the Coal City Police Department. (*Id.*) The Complaint also can be understood to allege violations of the Plaintiff's equal protection rights (*id.* at 15, 16), and a conspiracy to violate the Plaintiffs' constitutional rights (*id.* at 11, 18).

## I.    *Monell* and Immunity

This opinion discusses each constitutional claim in turn, but first it discusses Plaintiff's *Monell* claim against the Village, and principles of absolute and qualified immunity applicable to Assistant State's Attorney Schaller and the Defendant law enforcement officers.

### A.    *Monell* Claim against the Village of Coal City

Plaintiff alleges that the actions of the Defendant police officers have persisted over many years at the direction of Chief Neary, among others, and that those actions have been designed to discriminate against him and his children and deprive them of their civil rights. He states that Chief Neary "is behind most of this," (D.E. 71 at 11), and that the department as a whole has made concerted efforts against him as a result (*id.* at 18). These allegations—at least as interpreted under precedent concerning Rule 12(b)(6) requirements and *pro se* pleadings generally—assert municipal liability for constitutional violations as a result of a city policy or

practice under § 1983. *See, e.g., Monell v. Department of Social Servs. of the City of New York*, 436 U.S. 658, 690–91 (1978). In this regard, to hold a municipality liable under § 1983, the plaintiff must establish that: "1) he suffered a deprivation of a federal right; 2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy making authority for the City; which (3) was the proximate cause of his injury." *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002) (citing, *inter alia, Monell*). The Complaint's allegations suffice, at least at this stage of the proceedings.

More specifically, the Complaint is understood to allege that Mr. Holm and his children have suffered the deprivation of, at a minimum, their Fourth and Fourteenth Amendment rights, in addition to suffering a conspiracy to violate their rights. As stated, the Complaint alleges that "Chief Dennis Neary is behind most of this." (D.E. 71 at 11.) Other allegations are of a similar piece: for example, the Complaint states that, "Dennis Neary . . . and William Klegman are always been behind what Coal City Police Officers due [sic] to me, that's why they write the tickets & complaints at the police station so they can contact either Neary or Klegman or Schaller and then come back to give the tickets." (*Id.* at 18.)

Under Seventh Circuit precedent, such allegations sufficiently state a claim for municipal liability; moreover, precedent further establishes that the allegations are not legally defective even though they are often asserted without factual detail or explication. *See, e.g., McCormick v. City of Chicago*, 230 F.3d 319, 325 (7th Cir. 2000). Because Mr. Holm has made allegations that sufficiently give the Village notice of his municipal liability claim for alleged illicit customs, policies, or official actions, the Court respectfully denies the Defendants' motion to dismiss the *Monell* claim against the Village.

11

## B. Absolute Immunity for Assistant State's Attorney Schaller

The Complaint asserts that Illinois Assistant State's Attorney John Schaller deprived Plaintiff of his constitutional rights when Schaller prevented the Coal City Police from investigating alleged crimes against Plaintiff (D.E. 71 at 19), and failed to prosecute those who committed crimes against Plaintiff. (D.E. 71 at 16). ASA Schaller contends that any claim for failure to investigate is non-actionable, and that he is entitled to absolute prosecutorial immunity for any claims arising from any of his prosecutorial decisions. (D.E. 82 at 6–9.)

It is well-settled that a state prosecuting attorney is absolutely immune from suit under § 1983 for those activities "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 427, 430 (1976). A state's attorney's decision whether to pursue a criminal charge is such activity, and is the quintessential activity protected by the doctrine of prosecutorial immunity. *See Imbler*, 424 U.S. at 425; *Anderson v. Simon*, 217 F.3d 472, 475 (7th Cir. 2000) (prosecutor's refusal to charge a suspect is an immunized prosecutorial activity). Therefore, Plaintiff's claims against Schaller are dismissed.[5]

Notwithstanding that the claims are dismissed, the dismissal is without prejudice. Although Mr. Holm does not sufficiently outline or adumbrate any non-barred claims against ASA Schaller, the law does provide that even a prosecutor is not absolutely immune for truly investigatory activities, which are subject only to qualified immunity. *See, e.g., id.*, 217 F.3d at 475. The line between these two areas, like many, is not always pellucid: for example, the

---

5 In his Brief in Opposition to Schaller's Motion to Dismiss, Holm makes new allegations that Schaller and several Coal City Police officers conspired to batter him. (*See* D.E. 89 at 7.) These are new claims not properly asserted in a Brief in Opposition to a Motion to Dismiss because "[i]t is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) (collecting cases). Therefore, the Court

decision whether to bring charges against a party or to further investigate; or the decision to bring charges as against one person over another, even where those individuals dispute who was the criminal and who was the victim, in some ways involve assessments about the appropriateness *vel non* of further investigation and the propriety of investigation to date. Nonetheless, these sorts of issues have been held to be subject to absolute immunity. *See id.* at 475–76. Similarly, the Seventh Circuit has held that a prosecutor could not be liable under § 1983 for recommending "that the police hold a lineup to create more evidence against" a suspect who therefore was maintained in custody, because the police were not under "any duty to follow the state's attorney's orders or suggestions. *Id.* at 476. These parameters appear to encompass the allegations outlined or suggested in Mr. Holm's complaint, and therefore the claims against ASA Schaller have been dismissed. If Mr. Holm attempts to replead these claims, the Court will assess their propriety when that contingency eventuates.

## C.   Qualified Immunity for Law Enforcement Officers

Precedent teaches that "[p]olice officers are entitled to qualified immunity for actions taken during a stop or arrest insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001) (internal quotation marks and citation omitted). In determining whether an officer is entitled to qualified immunity, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *accord, e.g., Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003). If

---

declines to consider these new claims.

13

no constitutional right has been violated, that is the end of the qualified immunity analysis. *See Saucier*, 533 U.S. at 201.

If a violation could be made out on the facts taken in the light most favorable to the plaintiff, the next step "is to ask whether the right was clearly established"—that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201–02 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Moreover, "[o]nce a defendant has pleaded qualified immunity, the plaintiff has the burden to demonstrate the existence of the clearly established constitutional right." *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir.1997) (citation omitted).

Precedent teaches that it is "vital" that "[t]his inquiry . . . must be undertaken in light of the specific context of the case." *Saucier*, 533 U.S. at 201. "The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Id.* (internal quotation marks and citation omitted). Precedent also makes clear that "the doctrine of qualified immunity leaves 'ample room for mistaken judgments' by police officers." *Payne*, 337 F.3d at 776 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)); *accord, e.g., Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.") (citing *Malley*, 475 U.S. at 344–45); *id.*, 475 U.S. at 341 ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

## II. Constitutional Claims under § 1983

With these principles in mind, the Court addresses each of Plaintiff's constitutional claims.

### A. Claims Regarding Seizure of Daniel Holm's Scooter

At some unspecified time after the July 2 scooter traffic stop, Officer Harseim stopped Daniel Holm again while Daniel was riding the scooter on the sidewalk, and took the scooter from him. (D.E. 71 at 20.) According to the Complaint, Officer Harseim "pulled his vehicle in front of my son, popped out, grabbed it and put it in the back of his police vehicle and took off with it back to the station. He didn't give him no ticket, no nothing, just took back off with it." (D.E. 85-7 at 2; *see also* D.E. 56 at 9.) A ticket for riding the scooter on the sidewalk was also issued. (*Id.*) Further, Plaintiff claims that Officer Clark refused to return the scooter when presented with a court order to do so. (D.E. 71 at 20.) Plaintiff claims that these allegations constitute a violation of his Fourth Amendment right to be free from unreasonable seizures of his property. (*Id.* at 21.)

Officers Clark and Harseim argue that Plaintiff's claim for unreasonable seizure of the scooter fails because Plaintiff has failed to allege that the officers did not have reasonable grounds to believe an offense was being committed by Daniel Holm's use of the scooter. (D.E. 85 at 13.) Officers Clark and Harseim argue they had probable cause to arrest Daniel for unauthorized use of the scooter (*id.*), and that, in any event, the officers are entitled to qualified immunity with respect to the detaining of the scooter. (*Id.*)

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated . . ." U.S. Const. amend. IV. Precedent instructs that the Fourth Amendment protects property, *Soldal v. Cook County*, 506 U.S. 56, 62–63 (1992), and that "a 'seizure' of property occurs where 'there is some meaningful interference with an individual's possessory interests in that property.'" *Id.* at 61 (quoting *United States v. Jacobsen*, 466 U.S.109, 113 (1984)).

The Complaint pleads a Fourth Amendment violation concerning the taking of the scooter. To be sure, the Complaint is internally contradictory, in that Plaintiffs have attached certain police reports (among a disparate collection of materials) that relate the officers' rendition of the seizure. However, given that Plaintiff is proceeding *pro se*, the Court cannot simply seize upon those portions of the pleadings that are least favorable to Plaintiffs. Other portions of the pleadings make clear that Plaintiffs contend, at least at times, that the scooter was seized without any justification at all. (D.E. 85-7 at 2; D.E. 56 at 9.) Moreover, it is clear that all charges related to the scooter episodes were dismissed. If the police really had no justification at all for the seizure, then it is at least possible that a viable claim exists. In addition, while it is possible that the seemingly byzantine nature of scooter regulation in Illinois as of 2005 might provide a basis for a winning summary judgment challenge on qualified immunity grounds, that defense has not been put forward at this stage, at least with any meaningful degree of clarity sufficient to at least promote the opportunity for reasoned briefing on the subject by either side. The Court will certainly entertain such argument when and if it is properly advanced, but on the basis of the assembled pleadings, Plaintiff's claim for unlawful seizure of the scooter survives Defendants' motion to dismiss.

16

### B.  Claims Specific to Holm's Arrest on July 3

Mr. Holm alleges that on July 3 Officer Clark and Sheriff's Deputy Onsen violated his Fourth Amendment rights by falsely arresting him, by ordering that his car be towed, and by using excessive force when taking Holm into custody.  He also appears to include Mr. Shain, the owner of the towing company, in his contentions.

Defendants Onsen, Clark, and Shain each claim that *Heck v. Humphrey* bars Holm's claims for damages arising from his July 3 arrest.  (*See* D.E. 79 at 5; D.E. 82 at 10, 11; D.E. 85 at 8.)  Officer Onsen also argues he had "no personal involvement" in the arrest, malicious prosecution, or wrongful towing of Holm's car.  (D.E. 82 at 10.)  Moreover, regarding both the tickets and the criminal complaints, Officer Clark argues that Plaintiff has failed to allege that the officers lacked probable cause, and that probable cause is an absolute defense to liability.  (D.E. 85 at 7–8.)  Officer Clark further argues that the officers *did* have probable cause to issue the tickets and criminal complaints, and that even if they did not, they are entitled to qualified immunity.  (*Id.*)  Officer Clark argues that Plaintiff's excessive force claim, in addition to being *Heck*-barred, fails because the force used was objectively reasonable under the circumstances.  (*Id.* at 12.)  *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  Defendant Shain argues that, as a private individual, he is not liable under § 1983.  (D.E. 79 at 6).[6]  For the reasons discussed

---

6 Defendant Shain also argues that Plaintiffs' claims are barred for failure to abide by the Court's pleading requirements.  (D.E. 79 at 7.)  The Court respectfully disagrees with Mr. Shain's assertion that Mr. Holm's failure to number the paragraphs of his Complaint or to limit his pleadings has "made it difficult if not impossible to flush out Plaintiffs' claims."  (*Id.* at 7.)  Precedent teaches that *pro se* complaints are to be generously construed, and the Complaint can be generously construed to identify the claims set forth herein, most of which have also variously been identified by the Defendants.

below, Defendants' motions to dismiss with respect to the claims arising out of the July 3 arrest are granted in part and denied in part.

### 1. *Heck* Analysis

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that, before a § 1983 plaintiff may recover damages for alleged harm "'caused by actions whose unlawfulness would render a conviction or sentence invalid,' the plaintiff must first prove that his conviction or sentence has been reversed, expunged, or called into question by the grant of a petition for habeas corpus." *VanGilder v. Baker*, 435 F.3d 689, 691 (7th Cir. 2006) (quoting *Heck*, 512 U.S. at 486). *VanGilder* explained that *Heck* is grounded in the "'strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction,'" *id.*, 435 F.3d at 691 (quoting *Heck*, 512 U.S. at 484).

The Seventh Circuit's decision in *Okoro v. Callaghan*, 324 F.3d 488 (7th Cir. 2003), provides further substantial teaching concerning the application of *Heck.* In *Okoro*, the § 1983 plaintiff disclaimed any intention of challenging the validity of his conviction for narcotics dealing (so as to avoid *Heck*) in the course of alleging that the defendant/law enforcement officers stole (and thus wrongfully seized under the Fourth Amendment) gems and cash that the plaintiff allegedly maintained in his home. *Okoro*, 324 F.3d at 489. The Seventh Circuit explained, in finding Okoro's claims to be *Heck*-barred, that Okoro maintained that "he was not trying to sell the officers [and defendants in the Section 1983 civil suit] heroin . . .; he was trying to sell them gems and they stole them." *Id.* The Seventh Circuit further explained that, "[i]f that is true, then almost certainly he was convicted in error, for that testimony was an essential part of the evidence against him in the criminal case; and if he cannot prevail in his claim for the return

18

of the gems without undermining the criminal case against him, then he is barred by *Heck* unless and until he knocks out his conviction, which he has never done." *Id.* The Seventh Circuit underscored that a *Heck*-bar is appropriate under such circumstances, with the Seventh Circuit holding that, "[i]t is irrelevant that he [*i.e.*, Okoro] disclaims any intention of challenging his conviction; if he makes allegations that are inconsistent with the conviction's having been valid, *Heck* kicks in and bars his civil suit." *Id.* at 490 (collecting cases).

### 2. False Arrest

As discussed above, police are entitled to qualified immunity where there is no violation of a clearly established constitutional right. *See Saucier*, 533 U.S. at 201–02 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). In false arrest claims, probable cause is an absolute defense, even if the charges are later dismissed. *See, e.g., Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) ("An essential predicate to any § 1983 claim for unlawful arrest is the absence of probable cause.") (citing *Jones by Jones v. Webb*, 45 F.3d 178, 181 (7th Cir. 1995)). As the Supreme Court has explained in reviewing its probable cause jurisprudence, "[o]n many occasions, we have reiterated that the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent . . . [people], not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (various citations and internal quotation marks omitted); *see also United States v. Muhammad*, 120 F.3d 688, 696 (7th Cir. 1997) ("This flexible, commonsense probable cause standard rests on whether a man of reasonable caution would believe that the accused has committed a crime; it does not require that this belief be correct or more likely true than false.") (internal quotation marks and citation omitted).

19

In this case, Defendants Clark and Onsen arrested Plaintiff based on Harseim's previously issued complaint for obstructing a peace officer, as well as for Plaintiff's operation of an unsafe motor vehicle on the evening of July 3, 2005. (D.E. 85-5 at 10.) (As explained below, Mr. Holm testified under oath that he was driving a car that had no operative headlight—indeed no headlight housing at all—on his car. (*See, e.g.*, D.E. 85-9 at 13–14, 23.)) Plaintiff was ultimately convicted on a modified obstruction of service of process charge, and though this conviction was not necessary, it is sufficient for a finding of probable cause to have arrested him. *Accord, e.g.*, *Kelley*, 149 F.3d at 646; *Jones by Jones*, 45 F.3d at 181.[7] Therefore, the Court grants Defendant Clark's motion to dismiss the false arrest claim.

### 3. Excessive Force

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the

---

7 Criminal suspects are routinely arrested and processed on charges that are different from the eventual charge(s) of conviction. Thus, for example, a suspected drug dealer might be arrested and initially detained on a barebones immigration violation—for any number of reasons, including that the law enforcement team does not want to reveal the real basis for the government attention. If the arrestee is subsequently convicted of a different violation that the arrestee also had committed, the arrest was nonetheless lawful. *See, e.g.*, *U.S. v. Ocampo*, 492 F. Supp. 1211, 1216, 1228 (E.D.N.Y. 1980) (finding that it would have been proper to arrest Defendant Hernandez based on immigration violations where he was charged with distribution of and conspiracy to distribute cocaine). Here, the scenario was even more modest than the garden-variety one outlined above. Mr. Holm was arrested on an issued complaint for obstructing a peace officer, which later was modified to a charge (that led to an eventual conviction) for obstructing service of process. That is sufficient: the propriety of an arrest does not erode if one violation has been advanced and another related one is ultimately the subject of the conviction.

individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations and quotation marks omitted). This "reasonableness" analysis is "not capable of precise definition or mechanical application." *Id.* To determine whether the force used to effect a seizure is unreasonable, the Court must examine the "totality of the circumstances" surrounding the incident. *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997). "[T]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" are specific factors for courts to consider. *Graham*, 490 U.S. at 396 (citation omitted). Importantly, all of these facts and circumstances "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

The Complaint and attachments thereto suggest that the two sides (*i.e.*, the Plaintiffs, on the one hand, and the law enforcement officers, on the other), have materially different accounts of the events of July 3, 2005, as they relate to the propriety of any force used by the police. The police officers essentially aver that Mr. Holm was obstructionist during the car stop—refusing to go to the police car without, at a minimum, physically pressing back against the officers and digging in his heels instead of walking peaceably. (D.E. 85-8 at 4–5, 18; D.E. 85-9 at 2; *see also* D.E. 85-5 at 10.) Mr. Holm paints a different picture: of a peaceful and compliant man, driving with his children after they had been blowing off fireworks together, who thereafter was needlessly roughed up by the police after his arrest. (*See, e.g.*, D.E. 85-9 at 17–21; D.E. 71 at 4 (discussing hospital documents which showed "whiplash of neck and right rotary"); *id.* at 7 (similar).) At his criminal trial, Mr. Holm expressly denied any attempt to resist while being

21

handcuffed (D.E. 85-9 at 18–19), and he denied fighting with the officers, too (*id.* at 19). He also denied spitting, kicking, and pounding on the squad car windows (*id.* at 20–21). In the Complaint, Plaintiff again claims that he was roughed up by the police and proffers certain hospital records in support of his claim. (*See* D.E. 85-4 at 8–14.)[8] If Mr. Holm's version of events is correct—that he was completely blameless, and that the police nonetheless struck him—he could have a winning excessive force claim. The Court must credit his version of events at this stage, and so dismissal of the excessive force claim is not appropriate.[9]

### 4. Fourth Amendment Claim Concerning the Seizure/Towing of Holm's Car

The Supreme Court has long taught that the police may remove and impound automobiles which "jeopardize the public safety" or which improperly undermine "the efficient movement of vehicular traffic." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976); *see also id.* at 368 ("As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in working order."). In this regard, *Opperman* taught that, "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Id.* at 369.

---

8 In the interests of completeness, the Court notes that these records suggest that Mr. Holm may not have gone to the hospital until after he was involved in a motor vehicle accident. (*See* D.E. 85-4 at 11, 14.)

9 Defendants note that, at Mr. Holm's criminal trial for resisting arrest, at which he was seemingly acquitted, the trial court rejected a motion for a directed verdict after noting that the State had made out a prima facie case in its case-in-chief. However, that finding does not warrant rejection of Mr. Holm's claim here. The trial court at the criminal trial was required to assess whether a reasonable jury could convict Mr. Holm if it credited all of the State's evidence—i.e., the testimony of the law enforcement officers. Here, the situation is reversed: this Court must credit all of Mr. Holm's testimony. If all of Mr. Holm's testimony were credited, he could potentially make out an excessive force case. There also is no Heck bar because he seemingly was acquitted of the state resisting arrest charge concerning this episode.

Mr. Holm has attached various transcripts from his underlying state court criminal proceedings to his Complaint, which the Court considers along with intertwined transcripts from those selfsame proceedings proffered by the defense in connection with the pleadings at issue. *See, e.g., Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (documents appended to complaint and centrally related to claims can be properly considered in connection with motion to dismiss) (citing *Levinstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)); *see also* Fed. R. Evid. 106 (rule of completeness). In the transcript from Mr. Holm's underlying resisting arrest trial, which concerned the events of the evening of July 3, 2005, everyone—including, most significantly, Mr. Holm—agreed that Mr. Holm's car was substantially damaged when he was stopped while driving on the evening in question. Thus, for example, Mr. Holm testified that his car had previously been in an accident and an entire headlight and headlight mounting was missing when he was stopped. (*See, e.g.,* D.E. 85-9 at 23 (Mr. Holm's statement that, "The whole thing was gone."); *see also id.* at 13–14 (Mr. Holm confirming that the events occurred in the evening, at about 9:40 p.m.). The officers were in agreement with this assessment, noting that the vehicle had "extensive front end damage," "that there was no light housing" on the driver's side, and that the equipment violation was one of the reasons for the car stop. (D.E. 85-7 at 15; D.E. 85-8 at 1.)

The police were entitled, under the authority of *Opperman* and the caselaw it collects, to stop Mr. Holm for driving a vehicle at night which did not even have a headlight housing. Such a vehicle is obviously dangerous, and his operation of such a dangerous vehicle at night on a public thoroughfare (as well as, independently, the pending criminal charge against him for the events of July 2, 2005), warranted his arrest. In addition, even if the police had not elected to arrest him, they could have seized the dangerous vehicle he had elected to drive on the evening of

23

July 3, 2005. *See, e.g., United States v. Velarde,* 903 F.2d 1163, 1166–67 (7th Cir. 1990) ("Removing the car from the roadway served to protect [defendant] Velarde's property and was part of the officer's community caretaking function, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.") (internal punctuation and citations omitted). Put differently, an officer is not *required* to arrest a driver in order to get an unsafe vehicle off the road; instead, the officer may elect to take the less-aggressive step of warning the driver about the unsafe vehicle, but still require the driver to surrender the car so that it can be towed to a garage pending repairs that will remove the threat it poses to other members of the community. *Id.*

Mr. Holm notes in his pleadings that, instead of assessing him a $65 towing fee, his friend, Mr. Van Arkle, perhaps could have driven the car to Mr. Holm's house. However, this suggestion ignores the central problem: *i.e.*, by Mr. Holm's own sworn account of events, the car was unsafe because it was missing not only an operative headlight, but the entire headlight mounting itself. *(See, e.g.,* D.E. 85-9 at 23.) Fortunately, no harm had eventuated to Mr. Holm, his children, or anyone else by virtue of his having driven the unsafe car on the evening of July 3; however, having Mr. Van Arkle *exacerbate* that danger by further driving the unsafe vehicle is certainly not a result that the Fourth Amendment requires. Mr. Holm offers no authority for the proposition that police must, as a matter of Fourth Amendment law, allow an unsafe vehicle to be driven from a scene if a willing bystander is prepared to continue the unsafe operation that the driver himself recklessly initiated. As a result, the motion to dismiss, insofar as it relates to the seizure of Mr. Holm's automobile, is respectfully granted.

### 5. Section 1983 Liability against Bill Shain, a Private Individual

Plaintiff alleges that Bill Shain, owner of Quality Towing, is liable under § 1983 for the towing of his car on July 3. Because the seizure was not improper, no liability as against Mr. Shain can attach for that towing.

However, the Complaint, if read generously, alleges that Mr. Shain has conspired with various Coal City law enforcement officers to deprive Mr. Holm of his Fourth Amendment rights over the years, through other unjustified seizures of his automobile. (D.E. 71 at 18, 21.) As explained below, a private individual cannot not liable under § 1983 in the absence of sufficient involvement with public actors that the private individual can be said to operate "under color of law." *See generally, e.g., Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961). Moreover, even where the putative defendant's private citizen status is not disabling (*i.e.*, because of such intertwining with those operating under color of law), the law is clear that "Section 1983 will not support a claim based on a respondeat superior theory of liability." *Polk Co. v. Dodson*, 454 U.S. 312, 325 (1981); *accord, e.g., Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). In this regard, just as a municipal corporation is not vicariously liable upon a theory of respondeat superior for the constitutional torts of its employees—*see Monell*, 436 U.S. at 694—a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights. *See, e.g., Iskander*, 690 F.2d at 128 ("[I]t is clear that Zayre's [a department store/defendant] liability may not be based merely on the employer-employee relationship between it and the store detective. 'Section 1983 will not support a claim based on a respondeat superior theory of liability.'") (quoting *Polk*, 454 U.S. 325); *Ridlen v. Four County Counseling Center*, 809 F. Supp. 1343, 1351 n.4 (N.D. Ind. 1992) (collecting extensive

appellate caselaw). However, while Mr. Shain is not liable for any towing of the Plaintiff's car on July 3, 2005, the Court cannot, at the motion to dismiss stage, dismiss him from the case entirely. As explained below, it is possible that Plaintiff could prove facts, consistent with his Complaint, by which Mr. Shain could be liable as part of a putative conspiracy to deprive Mr. Holm of his Fourth Amendment rights that involved participants operating under color of law. (*See, e.g.*, D.E. 71 at 18, 21.)

### C. Other Potential § 1983 Claims

#### 1. Defendants Are Correct That Any Section 1983 Failure to Protect/Substantive Due Process Claim Must Be Dismissed.

Plaintiff's claims that Defendants failed to investigate crimes against him can be construed as claims that Defendants violated his due process rights. This claim, however, does not survive the motions to dismiss. The Supreme Court held in *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989) that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Construed as a substantive due process claim, Plaintiff's allegations of failure to investigate crimes against him allege the State's failure to protect him from the prospect of private violence. Thus, he has not alleged any conduct that deprived him of his substantive due process rights. *Accord, e.g., id.*, 489 U.S. at 195 ("The [Due Process] Clause is phrased as a limitation on the State's power to act, not a guaranty of certain minimal levels of safety and security. It forbids the States itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm by other means."); *id.* at 197 ("As a general matter then, we conclude that a State's failure to protect an individual against private violence simply does not

26

constitute a violation of the Due Process Clause.").

### 2. Plaintiff Does Potentially Have a Viable Equal Protection Claim under Applicable Precedent.

Both Supreme Court and Seventh Circuit precedent recognize the concept of a "class of one" equal protection claim. Such a claim may be brought where "(1) the plaintiff alleges that he has been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment or the cause of the differential treatment is a 'totally illegitimate animus' toward the plaintiff by the defendant." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (further internal quotation marks and citations omitted); *accord Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995) (citation omitted); *id.*, 53 F.3d at 179 ("If the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court."); *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (establishing a right to sue for a "class of one" violation of equal protection).

Plaintiff claims that Coal City police officers singled him and his children out for harassment, threats, intimidation, and criminal charges, in retaliation for his filing previous lawsuits against them and, in general, because of their animus against him. These allegations at least potentially relate to a putative "class of one" claim; given the generous construction that must be afforded at the Rule 12(b)(6) stage generally, and to *pro se* claims in particular, such a claim is potentially viable in the case, at least at this stage.[10]

---

10 To be sure, the law has hurdles that must be met in order for a putative "class of one" claim to remain viable for trial. *See, e.g.*, *McDonald v. Village of Winnetka*, 371 F.3d 992, 1003 (7th Cir. 2004) (collecting cases and discussing various requirements at play); *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 565–66 (2000) (Breyer, J., concurring) (expressing concern about the potentially expansive

27

### 3.     Plaintiff Has Pleaded Conspiracy to Deprive Plaintiff of Constitutional Rights under § 1983.

"For liability under § 1983 to attach to a conspiracy claim, defendants must conspire to deny plaintiffs their constitutional rights." *Hill v. Shobe,* 93 F.3d 418, 422 (7th Cir. 1996) (citation omitted). As a general matter, precedent teaches that no heightened pleading requirements apply to a § 1983 claim of conspiracy. *See, e.g., Tierney v. Vahle,* 304 F.3d 734, 742 (7th Cir. 2002). The Seventh Circuit has stated that "it is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Walker v. Thompson,* 288 F.3d 1005, 1007 (7th Cir. 1996). Here, Plaintiff has alleged numerous dates on which the Defendants conspired to deprive him and his family of his constitutional rights because of their desire to get back at him for previously filing lawsuits against them. (*See* D.E. 71 at 13, 17, 21.) Accordingly, the Court concludes that Plaintiff has provided Defendants with sufficient notice of his § 1983 conspiracy claim, and as a result has satisfied the requisite standards, at least at this stage of the case.[11]

By virtue of this claim, the various Defendants, other than ASA Schaller, who is subject to the absolute immunity ruling above, at least remain in the case to the extent of the conspiracy charge (and otherwise further to the extent identified above). Plaintiffs have advanced

---

nature of the "class of one" theory—for example, in the zoning setting). Nonetheless, this case is simply at the motion-to-dismiss stage, and such issues, to the extent they will be applicable concerning any record generated in discovery, can be addressed at later proceedings in the case.

11 Plaintiff alleges that Defendants violated his civil rights by retaliating against him because he has previously sued Defendant Village of Coal City. This claim appears to be largely, if not entirely, duplicative of a "class of one" claim. Nonetheless, to the extent it is of any practical consequence, such a retaliation theory is at least potentially in play under the caselaw. Moreover, caselaw teaches that a plaintiff may plead such a claim in conclusory form without providing meaningful specifics, so there are no pleading burdens to the viability of such a claim at the motion to dismiss stage. *See, e.g., Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir 2002).

blunderbuss and boilerplate conspiracy charges against the Defendants generally. (*See, e.g.*, D.E. 71 at 17 (alleging that the Defendant "Coal City Police Officers want to totally smear my good name, push me out of town and take my liveing [sic] from me, they want to stress me physically & mentally & now my children upon, falsely charging me for other complaints & tickets that were dismissed."); *id.* at 21 (claiming that all Defendants allegedly "have done everything in there [sic] power to deprive me & my children of are [sic] 4th Amendment Civil Rights."). Under applicable precedent, Plaintiffs are not required to aver more factual specifics. *See, e.g.*, *Walker*, 288 F.3d at 1007.

To be sure, and in the interests of fair treatment of the record, there are some signals that these "city wide conspiracy" allegations are perhaps not well founded. Thus, for example, a court transcript that Mr. Holm attaches to his pleadings reflects that one of the judges in his underlying state court proceedings recused himself because of "long standing concerns . . . with my impressions of Mr. Holm's veracity." (D.E. 85-10 at 28.) Nonetheless, precedent directs that such allegations are entitled to proceed, as a matter of law, at least at the present time. Nor have the Defendants moved for a qualified immunity finding as to these sweeping allegations. Such a motion seemingly would have been foreclosed in any event—at least at this threshold stage of the proceedings—because, under applicable precedent, Mr. Holm may plead a conspiracy in generic terms with the few specifics he provides here, and those allegations must be accepted as true, including for purposes of a qualified immunity analysis at the motion to dismiss stage. The result may be different after discovery—*see, e.g.*, *House v. Belford*, 956 F.2d 711, 721 (7th Cir. 1992) (mere allegations of a conspiracy are insufficient to withstand summary judgment)—but at this stage at least, the claims survive.

## CONCLUSION

For the reasons given above, the Defendants' motions to dismiss are granted in part and denied in part.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: 2/13/07